## The First Methodist Episcopal Church of Chicago

v.

## Arthur Dixon et al.

*Opinion filed February 17, 1899.*

1. Religious corporations—*buildings must be devoted to purposes of incorporation.* A corporation created "for purposes of religious worship," and authorized to receive and hold land and erect buildings for such purpose and no other, has power to erect only such buildings as are directly and distinctly appropriate to the advancement of the cause of religion and necessary to the comfort and convenience of the congregation when engaged upon religious duties.

2. Same—*religious corporation cannot erect office building.* Trustees of a religious corporation who are authorized, in case of the destruction of the church building, to convey the lot by deed or mortgage to secure money borrowed to rebuild or repair the building, have no power to erect a modern office building on the lot, or lease the ground for that purpose and procure another place of worship.

3. Same—*construction of special act of 1865 concerning Methodist Episcopal Church of Chicago.* Section 4 of the special act of February 13, 1865, which authorizes the trustees of the Trinity Methodist Episcopal Church of Chicago, in case of destruction or serious injury of the then existing church building, to convey the lot as security for money borrowed to rebuild or repair the building, does not create a continuing power, but a limited one, which was exhausted by a single exercise thereof after the Chicago fire.

4. Same—*former powers of trustees of Methodist Episcopal Church of Chicago not taken away by act of 1865.* The former power of the trustees of the Methodist Episcopal Church of Chicago to execute deeds and conveyances when so directed by the society or congregation, which shall have the same effect as like deeds of natural persons, is not taken away or limited by the act of February 13, 1865, which empowers them, without the direction of the society, to mortgage the real estate for the sole purpose of securing money borrowed to repair or rebuild the church building.

*First M. E. Church of Chicago v. Dixon,* 77 Ill. App. 166, reversed.

Appeal from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. Oliver H. Horton, Judge, presiding.

The appellant is a religious corporation organized by virtue of a general statute adopted by the General As-

sembly on the 6th day of February, 1835, under the corporate name of "The Methodist Episcopal Church of the town of Chicago." This corporate name was changed to "The First Methodist Episcopal Church of Chicago," its present name, by an act of the General Assembly approved February 14, 1857. The appellees, who are the trustees of the appellant church, filed this their bill in chancery in the circuit court of Cook county against the corporation, a number of the members of the church and the Trinity Methodist Episcopal Church. The bill alleged the appellant church was at the date of the passage of the said act of 1857, and ever since has been, the owner of a lot situated on the south-east corner of Washington and Clark streets, in the city of Chicago; that shortly after the great fire of 1871 it erected on said lot a four-story building covering the entire surface thereof, the first and second floors of which the corporation has always rented for business and office purposes and has appropriated the third and fourth floors to religious purposes, as an audience room for the congregation of the church, church parlors and a lecture room; that the building is not fire-proof and has no elevator; that it has a truss roof constructed with wooden trusses, which have largely decayed and have had to be patched and re-enforced and will have to be removed in the near future; alleges that adjacent to said building, upon the east side, there has been constructed by the Chicago Title and Trust Company a fire-proof building sixteen stories high, and this has rendered it very difficult to use the chimneys in the church building by reason of the draft therein being rendered imperfect and being interfered with by said building, and leading to the escape of gases and smoke; that the church building was erected shortly after the fire of 1871, in accordance with the methods of construction then in vogue; that since that day the methods of construction have largely changed; that elevators have almost universally been introduced in office buildings in

Chicago; that the property is in the heart of the business district of the city; that many large, commodious and fire-proof structures have been erected in the immediate neighborhood of the property, in which there is good elevator service and vault room, and with these buildings the church property has to compete in the rental of its property; that by reason of the decay in connection with the roof of the building, and the depreciation of the building by ordinary wear and tear, it would be necessary, in the near future, either to tear down said building or to make extensive and costly repairs thereon in order that the same may be available for use; that the audience room of the church building should not be situated higher than the second floor, and that if the building should be repaired and a new roof placed thereon it would still be wholly unsuited to the present requirements of the neighborhood in which it is situated and the church would still be unable to compete with other business buildings in that immediate neighborhood, and it would produce no adequate returns as compared with the value of the land upon which the building is situated. The complainants further say that at the date of the erection of the present building money was borrowed to pay, in part, the cost thereof, which indebtedness has since been paid in full and the lot is now free from any mortgage or incumbrance; that in order to secure any adequate returns from the lot it will be necessary in the near future either to make a ground lease thereof for a term of not less than ninety-nine years, or to tear down the present building and erect a modern building with elevators therein, and of the character of other buildings erected in the business part of Chicago within the last few years; that the said church has no considerable means available therefor, and in order to enable it to erect any such building it will be necessary to borrow money and to secure the re-payment thereof by mortgage or trust deed upon the lot. The bill set forth in full the special act passed by the General

Assembly in the year 1857, and also another special act approved February 13, 1865, but made no reference to the fact, which appears by way of recitation in the act of 1857, that the said appellant was incorporated under a general act providing for the incorporation of religious societies, approved February 6, 1835.

The prayer of the bill is that the powers of the complainants and their successors, as trustees of the First Methodist Episcopal Church, under section 4 of the amendatory act, under the facts now existing, as stated in this bill, with reference to conveying, by way of mortgage or trust deed, said lot for the purpose of securing money which may be borrowed by the complainants and their successors for the purpose of erecting a new building upon the lot, and also the powers of complainants and their successors with reference to making a long ground lease of the lot, may be construed by the court, and that the complainants or their successors be decreed to be vested with the power to convey said lot, by way of mortgage or trust deed, for the purpose aforesaid, and also in their discretion to make ground leases thereof for such term or terms as they may think best.

The defendants entered their appearance, and default was allowed against all of them except the appellant corporation, in whose behalf answer was filed admitting the allegations of the bill and submitting the question of the power of the trustees to encumber said lot and erect a new building thereon or make a ground lease thereon, as prayed in the bill. Proof was taken before a master and a decree rendered, to the effect the corporation might cease to use the lot as the site for a church house but might procure another building elsewhere for the religious purposes of the corporation, and that the trustees were vested with power to execute a mortgage or trust deed on the lot to raise a fund to be used in the erection of a new building thereon of the character referred to in the bill, or might make a lease of said lot

for business purposes for such term of years as might to said trustees seem best. The decree was affirmed by the Appellate Court for the First District, and the appellant corporation has perfected an appeal to this court.

William D. Barge, for appellant.

Wilson, Moore & McIlvaine, for appellees.

Mr. Justice Boggs delivered the opinion of the court:

The appellant corporation was organized under a general act of the General Assembly adopted in the year 1835, but by the provisions of a special act approved February 14, 1857, the powers possessed by religious corporations organized under the third division of chapter 25 of the statutes as then revised (Purple's Stat. 1856, p. 187,) were also granted to and conferred upon it. The general statute of 1835 and that of 1856 are not materially different. The statute in force in 1856 authorized religious corporations to receive land by "gifts and devises," which was not provided by the act of 1835, and to hold land in a quantity of ten acres, being five acres more than was provided by the act of 1835. Otherwise the powers conferred upon religious societies by the two statutes are the same.

Sections 44 and 46, division 3, chapter 25, of Purple's Statutes of 1856, relate to the powers possessed by the trustees of religious corporations, and are as follows:

"Sec. 44. It shall be lawful for the members of any society or congregation heretofore formed in this State for purposes of religious worship, and for members of any society or congregation which may hereafter be formed for the purpose aforesaid, to receive, by gift, devise or purchase, a quantity of land not exceeding ten acres, and to erect or build thereon such houses and buildings as they may deem necessary for the purposes aforesaid, and to make such other use of the land and make such other improvements thereon as may be deemed necessary for the comfort and convenience of such society

or congregation; and such society or congregation may assume a name and elect or appoint any number of trustees, not exceeding ten, who shall be styled trustees of such society or congregation by the name assumed; and the title to the land purchased and improvements made shall be vested in the trustees, by the name and style assumed as aforesaid."

"Sec. 46. The trustees elected or appointed under the provisions of this division, and their successors, shall have perpetual succession and existence; and the title to land herein authorized to be purchased, and to the buildings and improvements thereon, shall be vested in the said trustees by their assumed name, and their successors, forever, and the same shall be held for the uses and purposes herein named and no other; and such trustees shall be capable, in law, to sue and be sued, implead and be impleaded, answer and be answered unto, defend and be defended, in all courts of law or equity whatsoever, in and by the name and style assumed as aforesaid, and shall have power, under the direction of the society or congregation, to execute deeds and conveyances of and concerning the estate and property herein authorized to be held by such society or congregation; and such deeds or conveyances shall have the same effect as like deeds or conveyances made by natural persons: *Provided,* that no deed or conveyance shall be made of any estate held as aforesaid, so as to defeat or destroy the interest or effect of any grant, donation or bequest which may be made to any such society or congregation, but all grants, donations and bequests shall be appropriated and used as directed by the person or persons making the same."

Other powers were conferred upon the appellant corporation by the act of 1857, as follows:

"Sec. 2. Said First Methodist Episcopal Church of Chicago shall have power to convey said property in fee, by deed or mortgage, in security for money loaned or to be

loaned thereon for the erection on such real property of a place of worship, or such other improvements as may be desired; but after the erection of such place of worship or improvements, if any surplus remain, the same, and any rents which may accrue from said property, shall first be appropriated for the payment of said loan and extinguishment of such mortgage, and any remainder to the purchase of a lot or lots in said city of Chicago and the erection of a place or places of worship to be under the control of the Methodist Episcopal Church, and for no other purpose whatsoever."

Acting upon the assumption it possessed power so to do by virtue of the special act of 1857, the appellant corporation, on the first day of January, 1859, issued twenty interest-bearing bonds of the denomination of $1000 each, and executed a deed of trust covering said premises to secure the payment of the bonds, and created other liens on the said property and erected a building thereon, the character whereof is not disclosed beyond the fact that the corporation derived income and profit from it by way of rents.

On the 13th day of February, 1865, the appellant corporation obtained a second special act of the General Assembly. The first section of this act provided the board of trustees of the corporation should consist of nine persons, to be elected by the religious society of the appellant corporation and the society known as the Trinity Methodist Episcopal Church of Chicago by joint ballot, and contained the following provision relative to the powers of such trustees: "Said trustees so elected shall have power to control and manage the real property belonging to said corporation, and to dispose of the rents accruing therefrom, in conformity with the provisions of this act and the act to which this act is amendatory." Section 2 referred to the bonded and other indebtedness of the corporation, and authorized the trustees, after the bonded indebtedness and interest thereon had been dis-

charged, to apply the rents derived from the building on
the said lot to the purpose of providing a parsonage for
the use of the pastor of the congregation worshiping in
the building on the said lot, and also to aid in the erec-
tion of church buildings in the city of Chicago for the use
of the Methodist Episcopal Church. Section 3 authorized
the trustees to appropriate out of the rents derived from
the building on said lot an amount not exceeding $1000
per annum to the support of the minister who should
preach the gospel to the congregation worshiping in the
said building. Section 4 of the act is as follows. "In or-
der to secure the payment of any indebtedness now owing
by said corporation, or any part of such indebtedness,
or in case of the destruction or serious injury of said
building from any cause, the same and the lot on which
it stands may be conveyed by said trustees, by mortgage
or deed of trust, as security for money borrowed to pay
such indebtedness or to re-erect or repair said building,
but shall not be aliened or conveyed for any other pur-
pose whatever."

The building which the act of 1857 authorized to be
erected and which stood upon the lot at the time of the
passage of the act of 1865 was destroyed by the fire of 1871.
In pursuance of the power assumed to be conferred upon
them by the provisions of said section 4 of the act of 1865,
the trustees of the appellant corporation erected upon
the lot the four-story building which now stands thereon,
being the building referred to and described in the bill of
complaint filed herein by the appellee trustees.

The theory of the bill, and that upon which the circuit
and Appellate Courts have acted, is, the appellee trustees
are now vested, by the provisions of said section 4 of the
act of 1865, with power and authority to erect upon the
lot another building of that character proper and suitable
to be rented for business purposes and to produce income
by way of rents in the event "of the destruction or serious
injury from any cause," to the building now upon the lot,

and that the fact the present building is out of repair, is not fire-proof, has no elevator, is not of modern construction, and, by reason of the many changes and improvements in the manner of constructing and equipping buildings to be used and rented for business and office purposes, cannot compete with many buildings more recently erected in the immediate vicinity more modern in style and equipped with the latest conveniences and improvements, and that it is not adapted to the needs of the locality, is dilapidated in a degree, amounts to the serious injury contemplated by the provisions of said section 4. Proceeding upon this theory and construction of the said section 4, the circuit court decreed it was not necessary that a place of worship should be maintained in any building on said lot, and that the appellee trustees had full power and authority to tear down and remove the building now on said lot and to erect thereon a new building not to be devoted, in any part, to the religious purposes of the corporation but to be rented for office and business purposes, or that said trustees had ample power and authority to make a lease of said lot for the term of ninety-nine years, or for a longer or shorter term, as might to them seem expedient, for the purpose of permitting it to be used and devoted wholly to purposes apart and distinct from the religious uses of the appellant corporation, and that the trustees might provide a place of worship for the congregation in some other place in the city of Chicago. This view as to the rights and powers of the appellant corporation and its trustees is not warranted by the correct construction of the general statute or either special statute by virtue whereof it is invested with corporate life or power, is unsound in principle, antagonistic to the settled public policy of the State and cannot prevail.

We will first consider the powers granted the appellant corporation and its trustees by the general statute in force at the time of the adoption of the special act

of 1857.   Sections 44 and 46, division 3, chapter 25, pages 188 and 189, Purple's Statutes of 1856, referred to in the special act of 1857 and hereinbefore set out, contain all provisions then in force relative to the powers to be possessed and exercised by incorporated religious societies. The express provision of said section 44 is, such associations are created "for purposes of religious worship," and the authority given them to receive and hold land is that they may receive a quantity not exceeding ten acres, and as to the power of such associations to erect houses and buildings on the land owned by them the provisions of the section are they may build such houses as they may deem necessary "for the purposes aforesaid," (namely, the purposes of religious worship,) and make such other improvements thereon as may be deemed necessary for the comfort and convenience of the society or congregation. The enactment is free from ambiguity and its meaning is not doubtful.   The power to construct buildings or make improvements of any kind is unmistakably restricted to such buildings as are directly and distinctly appropriate to the advancement of the cause of religion, and to such improvements as are necessary or appropriate to add to the comfort of the members of the society or association, and of others who may affiliate with members in the religious exercises of the association, while such members or other persons are engaged in religious duties, services or worship, and to remove all that which tends to their inconvenience while so engaged.   The building and improvements comprehended in the meaning of the statute are such only as pertain, not remotely and mediately but directly and immediately, to the advancement of the purposes of a society whose sole object is to provide and maintain a place of religious worship.   Section 46 expressly declares that the lands possessed by such corporations "shall be held for the uses and purposes herein named, and no others."   This language is susceptible of but one meaning, which is, that the corporations to be

formed under the act shall confine their efforts to the precise purposes of their creation. To hold such associations may devote their lands and buildings to secular uses is to pervert both the letter and the spirit of the statute. Corporations possess what are known as incidental powers, but incidental powers are such as are necessary in order to enable a corporation to carry into execution the specific powers conferred upon it by its charter. "Implied powers exist only to enable a corporation to carry out the express powers granted,—that is, to accomplish the purpose of its existence,—and can in no case avail to enlarge the express powers, and thereby warrant it to devote its efforts and capital to other purposes than such as its charter expressly authorizes, or to engage in collateral enterprises not directly but only remotely connected with its specific corporate purposes. A power which the law will regard as existing by implication must be one in a sense necessary,—that is, needful, suitable and proper to accomplish the object of the grant, and one that is directly and immediately appropriate to the execution of the specific powers, and not one that has but a slight, indirect or remote relation to the specific purposes of the corporation." (*People* v. *Pullman Palace Car Co.* 175 Ill. 125, and cases and authorities there cited.) The enumeration of powers in the charter of an incorporation, or in the act under which it is incorporated, implies the exclusion of all powers not enumerated. *Thomas* v. *Railroad Co.* 101 U. S. 82.

It is, however, urged the requisite authority to remove the building now upon the lot and abandon the use of the lot for religious purposes and erect a house thereon for commercial and business uses, or to make a long lease thereon to others for secular uses, is to be found in the special acts of the General Assembly approved, respectively, February 14, 1857, and February 13, 1865. It may be well, before entering upon the discussion of the legal effect of these acts, to note some general principles gov-

erning and controlling the possession and use of real estate by corporations and the construction and operation of special franchises.

It is against the public policy of this State to allow corporations to hold real estate beyond what is necessary for the transaction of the business or specific corporate purposes of such corporations. (*Carroll* v. *City of East St. Louis*, 67 Ill. 568; *United States Trust Co.* v. *Lee*, 73 id. 142.) "Irrespective of the operation of statutory restrictions, it is a settled principle of American jurisprudence that a corporation cannot take and hold land except in so far as reasonably necessary to carry out the objects of its creation. These bodies, which never die, are not allowed, against the objection of the State, to take and hold land for purposes wholly foreign to the purposes for which the State endowed them with corporate existence and the power of perpetual succession." (5 Thompson's Law of Corp. sec. 5772.) This public policy is further manifested by the express declaration found in section 1, of chapter 32 of the Revised Statutes, being the general act providing for the formation of corporations in this State, that charters shall not be granted to corporations to deal in real estate by virtue of the act, and the further fact that no enactment is to be found in the statutes of our State authorizing the formation of such companies. Also the policy is further evinced by section 5 of the same general act, which requires that real estate acquired by a corporation in the collection of debts, unless it shall be necessary and suitable for the chartered purposes of the corporation, shall be annually offered by the corporation for sale at public auction, and shall be sold whenever any one will pay an amount not less than the debt for which the land was taken; and by the further provisions of the same section making it the duty of the State's attorneys in the various counties to enforce such disposition of the property through the medium of an information filed in the courts against the corporation so offending.

Again, it is against the policy of this State that any corporation shall receive a special or exclusive franchise by virtue of any special law. Such was the policy of the State as to religious corporations when the act of 1835, under which this corporation was chartered, was enacted, as is manifested by the preamble to that act, which is as follows: "Whereas, petitions are frequently presented to the legislature of the State to incorporate religious societies; and whereas, if said acts of incorporation were granted it would lead to an endless system of partial legislation; and whereas, all religious societies of every denomination should receive equal protection and encouragement from the legislature and no one society be granted exclusive privileges; therefore." (Sess. Laws of 1835, p. 147.) Speaking of the rule to be employed in construing a grant of special privileges or the claim of exemption from the operation of general laws, Morawetz, in his work on Private Corporations, (vol. 1, p. 307,) says: "It should always be presumed that the legislature does not intend to confer franchises of this character unless a contrary intention be expressed in unambiguous terms. In *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 659, Mr. Justice Swayne said: 'The rule of construction in this class of cases is, that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms or by an implication equally clear. The affirmative must be shown. Silence is negation and doubt is fatal to the claim. The doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court.' * * * Every presumption will be made against the existence of an exemption from taxation, or from the general laws relating to usury, or of a right to a monopoly, or special privilege to the exclusion of others."

In construing and giving present effect to the special enactments under consideration we are to bear in mind the well settled public policy of this State as to the power

of corporations to hold and possess land for purposes not directly appropriate to the specific chartered purposes of the corporation, and the other rule of public policy the special privileges shall not be granted by local or special laws, and also the strict rule of construction to be applied to grants which are relied upon as authorizing the enjoyment of special privileges. Guided by these considerations we may proceed to consider and determine the true meaning and effect of the special enactments of 1857 and 1865.

Section 1 of the former of these acts provides the mode of electing trustees for the corporation, and it is not contended it adds to the power of such trustees. Section 2 of the act authorizes the trustees to convey the said lot, by deed or mortgage, in security of money to be borrowed, and to apply the money so secured to the "erection on such real property of a place of worship or such other improvements as may be desired." Assuming the words "the other improvements" meant buildings of any character, whether suitable or appropriate to religious purposes or not, the trustees issued bonds of the corporation to the amount of $20,000, executed a deed of trust to secure the same and erected upon the lot a building, the character of which is not disclosed further than that it was devoted, at least in part, to the purposes of business and that it produced rents which came to the hands of the trustees. Conceding, without deciding, the construction thus given to that special act was warranted, it need only be said that the act served all of the purposes comprehended in that construction and has no present effect. For the reason, in part, that act had served the ends it was designed to effect, application was made for the special act of 1865. Section 1 of the act of 1865 changes the mode of selecting the trustees. Sections 2 and 3 relate to the disposition to be made by the trustees of the rents received from the building then on the lot. Section 4 is as follows: "In order to secure the payment of any indebtedness now owing by

said corporation, or any part of such indebtedness, or in case of the destruction or serious injury of said building from any cause, the same, and the lot on which it stands, may be conveyed by said trustees, by mortgage or deed of trust, as security for money borrowed to pay such indebtedness or to re-erect or repair said building, but shall not be aliened or conveyed for any other purpose whatever."

This section authorizes the trustees, "in case of the destruction or serious injury of said building from any cause," to re-erect or repair said building. The building then upon the lot, and the one to which the section had reference, was destroyed by the fire of 1871, and the trustees executed the power given them by that section by erecting the building now standing on the premises. The power given has been enjoyed, was not a continuous power, but was exhausted by its exercise. That such power should be deemed continuous and perpetual and now existing is not within the letter or the spirit of the enactment, is opposed to the settled public policy of the State as declared by the general act under which the appellant corporation came into existence and evinced by the provisions of the general act now in force relative to the creation of corporations, and by the provisions of the constitution of 1870 and by repeated decisions of this court. The acts of 1857 and 1865 granted special powers and privileges to the corporation and its trustees for the purpose of enabling it to accomplish particular and specific ends. These ends have been accomplished, and the enactments have no virtue to invest the corporation with perpetual right to exercise such special powers and privileges in order to accomplish other ends and objects.

Nor is the appellant corporation, by reason of anything contained in section 4 of the act of 1865, deprived of the power to alien and convey the premises in question. Section 3 of the act of 1835 provides the trustees "shall have power, under the direction of the society or

congregation, to execute deeds and conveyances of and concerning the estate and property herein authorized to be held by such society or congregation, and such deeds or conveyances shall have the same effect as like deeds or conveyances made by natural persons,"—provided such conveyance should not defeat or destroy the intent or effect of any grant, etc.; and the same power, expressed in the same words, is given by section 46 of the general act of 1856 hereinbefore set out. Said section 4 of the act of 1865 authorized the trustees to convey the property, by mortgage or deed, for the purposes specified in the act, without the direction of the society or congregation, and the true meaning of the concluding clause of said section 4, "but shall not be aliened or conveyed for any other purpose whatever," is the authority given the trustees by the section to convey the lot, by deed or mortgage, without the direction of the society or congregation, should not be construed to invest the trustees with power to mortgage or convey the property for any other purpose than that contemplated by the section. Authority to alien and convey it "under the direction of the society or congregation" is in nowise affected by the limitation expressed in the concluding clause of said section 4.

The conclusion is irresistible the appellant and its trustees are without power to erect on the premises a building to be rented for business and commercial uses and to engage in conducting and managing a structure of that character, or by means of a long lease of the ground devote the lot to a use entirely foreign to the objects the corporation was chartered to advance and conserve.

The decree of the circuit court and judgment of the Appellate Court affirming it are each reversed. The cause is remanded to the circuit court, with instruction to that court to enter a decree denying the prayer of the bill and declaring the powers of the appellant corporation and its trustees in conformity with the views herein expressed.

*Reversed and remanded.*